BUDD (BARTLETT v.). See Case No. 1,075.

---

## Case No. 2,101.

### BUEL v. TULEY.

[4 McLean, 268.][1]

Circuit Court, D. Ohio. July Term, 1847.

BOUNDARIES.

Judge Symmes's purchase, between the Miami rivers, was completed only for one million of acres. A base line was run from the Great Miami to the Little Miami river, so far from the Ohio river, as to admit of a straight line. And lines running north from the termini of the base, were run so as to include the land purchased. Lines were also run from the base, called meridian lines, north, from every mile on the base line, where a corner was marked, and at the termination of each mile on those meridian lines, a corner was marked for sectional corners, extending through the first and second ranges. The east and west lines, being run to these marked corners, required zig zag lines. Afterward an east and west line was run by authority, as the northern boundary of the second range, and consequently the southern boundary of the third range. This left strips of land between the line thus run, and the zig zag lines formerly run, which gave rise to the present controversy. The court instructed the jury, that the lines by which the pur-

[1] [Reported by Hon. John McLean, Circuit Justice.]

chase was made, if run by authority, would govern. But if there was no such line, then the line run by the proper authority must govern.

[At law. Action of ejectment by the lessees of Buel against John Tuley and others. The jury found the defendants not guilty.]

Campbell and Corwin, for plaintiffs.
Wood and Ewing, for defendant.

OPINION OF THE COURT. This controversy arises out of the old and new lines, as they are called, both of which were run as the northern boundary of the second range, in Judge Symmes's purchase, and consequently, the southern boundary of the third range, between the Great and Little Miami rivers. On the 29th of August, 1787, Judge Symmes submitted a proposition to congress to purchase for himself and associates, all the lands lying between the Miami rivers, south of a line drawn due west from the western termination of the northern boundary of the grant to Sargent Cutler & Co., etc. But the contract first executed was only for one million of acres, terminating at a point on the Ohio river twenty miles above the mouth of the Great Miami. On a survey, this was found to terminate within the limits of the city of Cincinnati. Afterward, in 1792, on the petition of Judge Symmes, congress passed a law altering his contract so as to be bounded on the south by the Ohio river, and on the east and west by the Miami rivers, and on the north by a parallel of latitude so run as to include the million of acres. On the 26th November, 1787, Judge Symmes published a pamphlet containing the "terms of sale and settlement of the Miami lands," which regulated the price of the lands, the conditions of settlement, and other matters connected with the settlement of the country. By the contract of the "board of treasury" with Judge Symmes, the purchasers were required to survey the tract into ranges, townships, and sections, at their own expense, and surveyors were employed by the judge to do this work. The principal surveyor was directed to run a line east and west, from one Miami river to the other, sufficiently north to avoid the bends in the Ohio river, and to give a straight line for a base, on which he was directed to plant a stake at the termination of each mile. The assistant surveyors were then directed to run meridian lines by the compass, from each of those stakes, and to plant a stake at the termination of each mile, for a section corner. The purchasers were then left to complete the surveys by running east and west lines, at their own expense, to connect these corners. It must be perceived that this mode of executing the surveys was exceedingly defective, and would cause a zig zag line in every tier of sections, so as to strike the meridian, or north and south lines, at the sectional corners. These surveys extend-

ed only to the first and second ranges, which, with a few miles north of the military range, included the million of acres purchased by Symmes, and for which he obtained a patent. The third, or military range, had been conveyed by Symmes to Gen. Dayton, by deed dated 30th October, 1794.

Judge Symmes, in the above surveys of the meridian lines, had required the sectional corners to be marked only to the northern limit of the second range; and they were directed to continue those lines north, without marking sectional corners, six miles, which would terminate at the northern boundary of the third range, and consequently the southern boundary of the fourth. To supply this defect, Gen. Dayton appointed Col. Ludlow, who was, practically, the principal surveyor in the Miami country, and one of its most enterprising, meritorious, and adventurous pioneers, to make the survey and establish the section corners. The lines run by him, as boundaries of the range, interfere in some instances, with the corners previously made; but having been run by competent authority, they were confirmed, so far as they did not conflict with the survey directed by Judge Symmes, under the act of congress. On the 8th of February, 1789, Dunlap returned a survey which he had run, east and west between the two Miami rivers, to ascertain how far north the third range would extend, by fixing the northern boundary of the second range. The line run by Col. Ludlow, in June, 1790, was a straight line. In many parts of this line strips of land were left between it and the line which was made to strike the corners of the sections, as marked on the north and south lines, and this has given rise to the present controversy between the parties before us. The patent of Judge Symmes was dated the 30th of September, 1794, and the deed from Symmes to Muer, for section thirty-one, was dated the 27th of October, 1794. But the entry of this section was made by Mrs. Gaston, by the location of a warrant upon it (issued by Judge Symmes) in May, 1789. Muer afterward purchased the land, subject, of course, to the east and west line which might be run. At the time of the entry, the survey of the second range was not complete, as the northern boundary had not then been run. Dunlap's line was not intended to be the northern boundary of the second range. It can not be considered as an authoritative line for that purpose. The object was, in running it, to ascertain the southern boundary of the third range. To determine that question, the northern boundary of the second range should have been ascertained; but as Dunlap acted under no authority, his line could only be considered as an experiment for the purpose stated. The line of Col. Ludlow was run under authority, and as such must be regarded. Not, it is true, as altering boundaries which had been previously established by the proper authority, and

under which purchases had been made; but as establishing the line beyond controversy, in all cases where purchases were made subsequently. This line is colored yellow on the map. In 1807 Mr. Heaton surveyed the section line of thirty, which he designated by the blue lines Y, V, U, south, running to the old corner north; and in 1811 he, in company with Henderson, run the yellow line, (Ludlow's,) and found trees regularly marked. Dunlap's line was north of Ludlow's. Mr. Bigham, an old and practical surveyor, says that the corners of sections were marked on the north and south lines of range two, but the east and west lines were not, at first, run. He says if the plaintiffs are limited to the red line, as marked on the map, they will have five hundred and sixty-nine acres; by the yellow line, six hundred and ninety acres. Ephraim Catterlin says the north and south lines are about forty rods apart; and that McKane, the owner of a part of section thirty, said he should never claim north of the south line. The same thing is stated by Sheely, who heard the remarks of McKane some twenty-seven or eight years ago. S. Catterlin, a witness, heard McKane say he did not own the land, though he was cutting wood on it. Witness saw him dig down six inches; found a stone which he said was his corner. This corner was near Tuley's fence, which it is alleged is near the south line. Richard McKane conveyed to Robert McKane. The deed from Symmes to McKane was for one hundred and six acres, dated 7th of April, 1798. And there is no controversy as to the right of the lessors of the plaintiff; the point in contest is, as to boundary. The purchasers in the third range, claimed up to Ludlow's line, as their southern boundary; and several of the witnesses say that McKane did not claim north of that line.

The court instructed the jury, that when land is purchased by established lines, without the consent of the purchaser, those lines can not be altered, especially, so as to reduce the quantity of acres purchased. But if, in this case, there were no east and west line established, as the northern boundary of section thirty, when it was purchased; and that boundary was open to be established; the purchaser would be bound by the Ludlow line, it being authoritatively run. Or if, at the time of the purchase, Dunlap's line had been run, but had not been recognized as the true line, Dunlap not being authorized by Symmes to make the survey, that line does not limit the rights of either party. And especially after the Ludlow line was run, the occupiers and owners of section thirty recognized that as the true line, and claimed up to it, and not beyond it, for a great number of years; and rights have been acquired by purchasers north of that line, and extending up to it, and parties on both sides of the line have so claimed for many years; and this was known to the lessors of

the plaintiff at the time their rights were acquired, they are bound by that line, and can not claim beyond it. The jury found the defendants not guilty.